624 So.2d 874 (1993)
Wilmer CHAMBERLAIN and Beverly LeBlanc Chamberlain, Individually and on Behalf of their Minor Son, Chad Anthony Chamberlain
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, and ABC Lighting & Electrical Contractors, Inc.
No. 93-C-0472.
Supreme Court of Louisiana.
September 3, 1993.
Rehearing Denied October 7, 1993.
*875 William A. Porteous, III, Porteous, Hainkel, Johnson & Sarpy, New Orleans, for applicant.
Grady C. Weeks, Stephen P. Callahan, Weeks, Starks & Callahan, Houma, Richard P. Ieyoub, Atty. Gen., Baton Rouge, Charles T. Williams, Jr., New Orleans, J. Elliott Baker, Mandeville, for respondent.
HALL, Justice.[*]
This case squarely presents the issue of the constitutionality of LSA-R.S. 13:5106(B)(1),[1] which imposes a $500,000 ceiling on general damages recoverable in a personal injury suit against the State of Louisiana, its agencies, or its subdivisions. Finding the ceiling constitutional, the lower courts applied it to limit plaintiffs' general damage award. Upon review, we hold that the ceiling contravenes the constitutional proscription against sovereign immunity contained in LSA-Const. Art. XII, § 10,[2] and reverse.

*876 I.
On June 13, 1987, seventeen year-old Chad Chamberlain and two of his high school classmates went swimming in the Houma Canal, a tributary between Bayou Black and the Intracoastal Waterway. The three classmates swam around a bridge owned by the State of Louisiana and maintained by the Department of Transportation and Development ("DOTD"). The classmates engaged in a school yard game called "King of the Mountain," the intent of which was to determine who could control a certain area. To control the area, each tried to evict the others by pushing and shoving them from that area. In this instance, the area was one of the bridge's two bulkheads. The bulkheads were wooden fenders running parallel to the canal bank and perpendicular to the bayou, and were accessible from the side of the bayou by gangplanks. As the bulkheads were constructed to protect the bridge from navigating traffic, on top of the bulkheads were electrical navigation lanterns. At the time of the accident, however, the Houma Canal was little trafficked, and the bridge had been unmanned for over two years.
During their game, Chad Chamberlain was thrown off the bulkhead and failed to surface. Rescue efforts ensued and were successful. However, as a result of having remained underneath the water for over fifteen minutes and nearly drowning, Chad Chamberlain suffered severe brain damage. His parents, Wilmer and Beverly Chamberlain, filed suit on behalf of themselves and their son against, among others, DOTD. They averred that the bulkhead was under DOTD's control and that the electric system on the bulkhead was defective, causing electrical current to leak into the water. Continuing, they averred that Chad Chamberlain's encounter with this electrical current caused him to experience an electrical shock, which in turn caused him to nearly drown and which was responsible for his resulting severe injuries.
After a bifurcated bench trial, the district court held that plaintiffs proved that Chad Chamberlain's injuries resulted when he encountered the electric current presented in the water due to the defective bulkhead and established DOTD's requisite knowledge of the defect. The district court further found LSA-R.S. 13:5106(B)(1)'s ceiling constitutional. Nonetheless, anticipating a possible finding of unconstitutionality on appeal, the court rendered specific monetary awards for each of seven categories of general damages, which awards totaled $2,000,000. The court then applied the ceiling to proportionally reduce each of those awards so as to limit plaintiffs' total general damage award to $500,000. Particularly, the court itemized its general damage awards as follows (with the proportionately reduced after-ceiling amounts in parenthesis): (1) past mental pain and fright: $200,000 ($50,000); (2) past and future pain and discomfort: $200,000 ($50,000); (3) disability: $500,000 ($125,000); (4) past and future loss of decent life quality: $500,000 ($125,000); (5) past and future mental suffering: $200,000 ($50,000); (6) loss of consortium to Mrs. Chamberlain: $200,000 ($50,000); and (7) loss of consortium to Mr. Chamberlain: $200,000 ($50,000). The court stressed that "the above awards [were] given as the minimum amount this Court would assign were it not for the limitation of R.S. 13:5106B(1)." The court also awarded plaintiffs $3,453,781.42 in special damages for past and future medical expenses and loss of earnings capacity.
From that judgment, both sides appealed. In a lengthy, considered opinion, the court of appeal affirmed in all respects. From that decision, both DOTD and plaintiffs applied for writs. While we denied DOTD's application, Chamberlain v. State, 615 So.2d 334 (La.1993), we granted plaintiffs' application primarily to address the issue of LSA-R.S. 13:5106(B)(1)'s constitutionality. Chamberlain v. State, 615 So.2d 333 (La.1993).

II.
At the outset, we dispose of several subsidiary issues both sides raise. Plaintiffs raise three such issues. The first subsidiary issue plaintiffs raise, albeit obliquely, is the constitutionality of LSA-R.S. 13:5112(C), which fixes pre-judgment interest on personal injury and wrongful death claims against the state at six percent. That issue was neither raised *877 nor briefed below, and thus is not properly before us.
The second subsidiary issue plaintiffs raise is whether the parameters of a cause of action for emotional distress suffered as a result of injury to a third person laid out in Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990), should be modified or extended. Applying the Lejeune guidelines, both lower courts held that Mr. and Mrs. Chamberlain lacked independent claims for the emotional distress they suffered as a result of their son's injuries. As the record reflects that neither parent was present when the accident occurred nor shortly thereafter and that both parents learned of their son's accident from others, the court of appeal found lacking the threshold Lejeune requirement: that the claimant either view the injury-causing event or come to the accident scene soon thereafter and before substantial change has occurred in the victim's condition. We agree and decline the invitation to revisit Lejeune.
The third subsidiary issue plaintiffs raise is whether for purposes of applying the $500,000 ceiling on general damage claims, Mr. and Mrs. Chamberlain's loss of consortium claims should be recognized as separate and distinct from Chad Chamberlain's general damage claim, resulting in not one, but three claims, each subject to a separate ceiling. Both lower courts rejected that contention. In so doing, the court of appeal reasoned that loss of consortium claims are derivative, arising out of the tort victim's injuries, not separate and distinct personal injury claims. We pretermit consideration of this issue as we find LSA-R.S. 13:5106(B)(1)'s ceiling unconstitutional.
DOTD also raises two procedural arguments in its brief: (1) plaintiffs' alleged failure to properly join the attorney general as an indispensable party, and (2) plaintiffs' alleged failure to properly raise the constitutional issue below. We find both of these arguments unavailing.
DOTD's argument regarding plaintiffs' failure to join the attorney general as an indispensable party is premised on language to that effect in Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308 (La. 1984). In Lemire, supra, this court desisted from considering a constitutional challenge brought for the first time in the Supreme Court where the attorney general had not been served and had not been made a party. Since the attorney general had not been served, whether he had been made an actual party was irrelevant to the court's decision. In any event, that language was, at the least, an overstatement of the requirements set forth in LSA-C.C.P. Art. 1880.[3]
LSA-C.C.P. Art. 1880 did not contemplate that the attorney general be required to be joined as an actual party. Instead, LSA-C.C.P. Art. 1880 contemplated that the attorney general be served and be given an opportunity to be heard and to participate in the case in a representative capacity. This construction of LSA-C.C.P. Art. 1880 is bolstered by the post-Lemire enactment of LSA-R.S. 49:257(B),[4] which provides that the attorney general participates in cases in which a constitutional challenge is made "at his discretion" in a representative capacity. LSA-R.S. 49:257(B). See also LSA-R.S. 13:4448.[5]
*878 In the instant case, the attorney general was given formal notice by plaintiffs via certified mail in September of 1991, before the matter was lodged in the court of appeal. Further, the attorney general exercised his discretion under LSA-R.S. 49:257(B) to represent the state in this matter before both the court of appeal and this court. Thus, the requirements of LSA-C.C.P. Art. 1880 were satisfied.
DOTD's second argument is that plaintiffs failed to properly raise the constitutional issue below. As evidenced by the district court's reasons for judgment and the court of appeal's opinion, the constitutional issue not only was raised and briefed below, but also was addressed in great detail. Indeed, we granted plaintiffs' writ application to address the correctness of the lower courts' determinations on the merits of the constitutionality of the ceiling on general damages imposed by LSA-R.S. 13:5106(B)(1).

III.
LSA-R.S. 13:5106(B)(1), enacted by Act 452 of 1985, was one of six[6] separate statutory measures the legislature, for perceived good reasons, enacted in 1985 to relieve the state of some of the ordinary burdens of tort liability.[7] Delineating its perceived good reasons prompting the enactment of the ceiling on general damages, the legislature in LSA-R.S. 13:5106(E) found and recited:
(1) That judgments against public entities have exceeded ability to pay on current basis.
(2) That the public fisc is threatened by these judgments to the extent that the general health, safety, and welfare of the citizenry may be threatened.
(3) That the limitations set forth in this Section are needed to curb the trend of governmental liability abuses, to balance an individual's claim against the needs of the public interests and the common good of the whole society, and to avoid overburdening Louisiana's economy and its taxpaying citizens with even more new and/or increased taxes than are already needed for essential programs.
(4) That the purpose of this Section is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the constitution.
In short, the legislative goal prompting the enactment of the statutory ceiling was to protect the public fisc. See Comment, Limiting Strict Liability of Governmental Defendants: The Notice Requirement of the 1985 Legislation, 46 La.L.Rev. 1197 (1986). While we are not insensitive to the state's fiscal needs, we are constrained to note that the wisdom of this legislative goal is irrelevant *879 in regard to the legal principles that control our decision. "It is not our role to consider the policy or wisdom of the [legislature] in adopting [the statute]. It is our province to determine only the applicability, legality and constitutionality of the [statute]." City of New Orleans v. Scramuzza, 507 So.2d 215, 219 (La.1987) (collecting cases); Board of Commissioners of Orleans Levee District v. Dept. of Natural Resources, 496 So.2d 281, 298 n. 5 (La.1986) (noting that separation of powers precludes court from considering wisdom of statute).
Plenary power in the legislature is the rule; prohibitions on the exercise of particular powers is the exception. Board of Commissioners, 496 So.2d at 286; Cooley, 1 Treatise on Constitutional Limitations, 176-77 (8th Ed.1927) ("Cooley"). Unlike the federal constitution which grants powers, the Louisiana constitution, in general, limits powers. Polk v. Edwards, 1993 WL 364714, n. 4 (La.1993) (No. 93-CA-0362) (noting that "state constitutions typically contain limits on governmental authority rather than grants of power as with the federal constitution"); Board of Commissioners, 496 So.2d at 286 ("unlike the federal constitution, a state constitution's provisions are not grants of power but instead are limitations on the otherwise plenary power of the people of a state exercised through its legislature").
A corollary to the above precepts is that statutes are presumed constitutional, and the party challenging a statute's validity must articulate a particular constitutional provision that limits the legislature's powers. State in Interest of J.A.V., 558 So.2d 214, 216 (La.1990) (collecting cases); Board of Elementary and Secondary Education v. Nix, 347 So.2d 147 (La.1977). Such constitutional limitations may be not only express, but also implied. Tanner v. Beverly Country Club, 217 La. 1043, 47 So.2d 905, 912-13 (1950); Cooley, supra at 176-77 n. 4. When a constitutional challenge is made, the question thus is not whether the constitution empowers, but rather whether the constitution limits the legislature, either expressly or impliedly, from enacting the statute at issue.

IV.
We recently addressed the constitutionality of a similar statutory measure placing a ceiling on medical malpractice liability in Butler v. Flint Goodrich Hospital of Dillard University, 607 So.2d 517 (La.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993). There, we upheld the legislature's power to enact a ceiling on liability of private health care providers, LSA-R.S. 40:1299.42(B)(1),[8] over constitutional challenges based on the equal protection and access to court provisions, LSA-Const. Art. I, § 3, and LSA-Const. Art. I, § 22, respectively. While reurging these same constitutional challenges here, plaintiffs add a challenge based on the constitutional proscription against sovereign immunity, quoted above.[9]
The constitutionality of LSA-R.S. 13:5106(B)(1) thus depends upon the meaning of LSA-Const. Art. XII, § 10. On this issue, the parties express diverging positions.
Plaintiffs contend that the provision creates a constitutional right to sue the state in tort which right cannot be legislatively curtailed. Stated otherwise, they contend that this provision mandates a complete waiver of sovereign immunity for the state in tort; supersedes legislative discretion, modification or tinkering; and implicitly precludes the legislature from limiting the state's liability for general damages. Given that the constitution declares that the state shall not be immune from liability for injury to person *880 and that the word "liability" is clear and unambiguous, plaintiffs contend that LSA-Const. Art. XII, § 10(A) should be enforced as written. Continuing, plaintiffs contend that LSA-R.S. 13:5106(B)(1), which provides the state immunity from liability for general damages in excess of $500,000, contravenes LSA-Const. Art. XII, § 10(A) and thus is unconstitutional.
Conversely, DOTD contends that this provision merely spares a claimant a trip to the legislature to obtain its consent to sue the state. Stated differently, DOTD argues that since sovereign immunity was judicially abrogated before the 1974 Constitution, the sole effect of LSA-Const. Art. XII, § 10(A)'s adoption was to elevate that abrogation to constitutional status. On the topic of legislative powers, DOTD contends that limiting liability is exclusively a legislative function and that LSA-Const. Art. XII, § 10(A)'s adoption was not intended to abridge that legislative function, provided that any legislation so enacted comports with other constitutional provisions. Lastly, DOTD cites, as did the court of appeal, our opinion on original hearing in Sibley v. Board of Supervisors of Louisiana State University, 462 So.2d 149 (Sibley I), vacated on reh'g, 477 So.2d 1094 (La.1985) (Sibley II), for the general proposition that limiting recoverable tort damages does not contravene LSA-Const. Art. XII, § 10(A).

V.
As noted, the constitutionality of LSA-R.S. 13:5106(B)(1) primarily depends upon the meaning of LSA-Const. Art. XII, § 10(A). More narrowly, the question before us turns on the meaning of the proscription against immunity from liability language in LSA-Const. Art. XII, § 10(A). An understanding of the meaning of that language requires consideration of the historical evolution of the Louisiana constitutional provision on sovereign immunity. Beginning with the 1921 constitutional provision, it was a simple provision vesting in the legislature the discretionary power from time to time to consent to suit. In 1946, the provision was amended to add more details, primarily addressing the enforcement of judgments.
In 1959, this court, in an oft-cited pair of cases, construed the provision as it then existed as doing no more than giving the legislature the power to waive the traditional sovereign immunity from suit, but not the immunity from substantive tort liability (i.e., immunity from damages for wrongful death, personal injury or property damage resulting from the negligence of governmental employees). Duree v. Maryland Casualty Co., 238 La. 166, 114 So.2d 594 (1959), and Stephens v. Natchitoches Parish School Board, 238 La. 388, 115 So.2d 793 (1959). For a detailed discussion of this pair of cases see McMahon and Miller, The Crain MythA Criticism of the Duree and Stephens Cases, 20 La.L.Rev. 449 (1960) ("McMahon"). See also Williams, Governmental Immunity: Has It Really Been Abrogated?, 5 S.U.L.Rev. 217 (1979). Moreover, this court held that any attempt by the legislature to waive the state's immunity from liability would violate the constitutional provision.
This construction, as the commentators remarked, reduced the legislature's waiver of immunity to a mere invitation "to visit the courthouse" to file suit and to be thrown out shortly thereafter on an exception of no cause of action. McMahon, supra at 450 n. 5 (citing Leflar and Kantrowitz, Tort Liability of the States, 29 N.Y.U.L.Rev. 1363, 1365 (1954)); Comment, Legislative Waiver of Governmental Immunity, 10 Loy.L.Rev. 105, 111 (1959) (noting that this construction rendered legislative consent a "futile gesture"); Comment, Governmental Immunity: The End of "King's X", 34 La.L.Rev. 69, 70 (1973) (referring to legislative consent as an "empty promise"). This construction prompted a 1960 constitutional amendment to add the liability language to the constitution, assuring that any waiver of immunity would be both from suit and from liability.
Commenting on that amendment, this court stated in Hamilton v. City of Shreveport, 247 La. 784, 174 So.2d 529, 530 (1965):
[T]he Legislature of 1960 in adopting the aforementioned proposed amendment did so with the express purpose of nullifying the effect of [a pair of] decisions of this court ... holding that whenever the Legislature authorized suit under Section 35 of *881 Article 3 of the Constitution of 1921, as amended pursuant to Act No. 385 of 1946, it simply waived the traditional immunity of the state and its subdivisions from suit and did not constitute a waiver of the state or its agencies from liability for the negligence of one of its employees in the exercise of a governmental function.
Hence, this court concluded that each legislative authorization of suit was to be construed as "a waiver of the defendant's immunity from both suit and from liability." Id. at 532; see also Board of Comm'rs of Port of New Orleans v. Splendour Shipping & Enterprises Co., 273 So.2d 19, 24-25 (La.1973).
In Splendour, supra, decided in 1973 while the constitutional convention was under way, this court recognized that in Louisiana sovereign or governmental immunity was a judicially created doctrine, which was outmoded and which was inconsistent with the state's policy of requiring that state agencies either "act responsibly, or be subject to answer in court." 273 So.2d at 26. Thus, this court held that state agencies were not immune from suit in tort, abrogating sovereign immunity in tort cases.
The 1974 constitution continued the same immunity from liability language in both Section 10(A) and 10(B). Section 10(A) contains an absolute prohibition against immunity from suit and liability in contract and tort suits; Section 10(B) contains a requirement that in other suits a legislative waiver, when given, must be both from suit and from liability. Hargrave, "Statutory" and "Hortatory" Provisions of the Louisiana Constitution of 1974, 43 La.L.Rev. 647, 652-53 (1983) ("Hargrave"). The framers obviously did not intend to changebroaden or widenthe meaning of the immunity from liability language. Rather, the framers intended to give constitutional status to the proscription against immunity from substantive tort liability. The only real difference is that the framers removed the former discretionary right to consent to suit and liability in tort from the legislature and reserved that right inviolate to the people, making that right a concrete one, beyond the legislature's reach. The question thus becomes whether LSA-R.S. 13:5106(B)(1) contravenes that proscription against sovereign immunity from substantive tort liability. For the reasons that follow, we find it does.

VI.
To provide a framework for our analysis, we parse LSA-Const. Art. XII, § 10 into its sub-sections.
(i) Section 10(A)No Immunity in Contract and Tort:
The framers declined to adopt proposals to completely abolish sovereign immunity, opting instead to delineate in Section 10(A) the types of suits in which sovereign immunity clearly was to be constitutionally abolished suits "in contract or for injury to person or property"and to continue in Section 10(B) the legislative consent method contained in the previous constitution for an open-ended category of "other suits." Hargrave, supra at 651. In short, Section 10(A) represented a compromise between complete abrogation and precise categorization.[10]
As we have recognized, Section 10(A) sets forth the "fundamental premise" that "[n]either the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property." LSA-Const. Art. XII, § 10(A) (emphasis supplied); Monteville v. Terrebonne Parish Consolidated Government, 567 So.2d 1097, 1104 (La.1990). As Section 10(A) sets forth a mandatory prohibition against sovereign immunity in tort and contract suits, it is a self-executing constitutional *882 provision. Polk, supra (mandatory prohibitions are self-executing); Cooley, supra at 167 n. 1 (prohibitory or negative constitutional provisions are self-executing as no supplementary legislation is needed to give them effect). Section 10(A)'s self-executing nature is evidenced further by the marked difference in function and wording from non-self-executing provisions such as Sections 10(B) and 10(C), which both allocate powers to the legislature, the former to consent to suit in matters other than contract and tort, and the latter to establish procedures for such suits and to provide the method for enforcing such judgments. Hargrave, supra at 652.
Section 10(A)'s self-executing nature is evidenced still further by the objects it was meant to accomplish, to wit: (i) expressly alleviating the requirement under the prior constitution of obtaining legislative consent to sue the state in tort and contract, (ii) affirmatively reserving to the people the right to sue the state in such cases, and (iii) concomitantly limiting the legislature's power to modify that constitutional right. The latter limitation on the legislature's power is a necessary corollary of Section 10(A)'s self-executing nature, as self-executing provisions generally limit the legislature's power to legislate in the field by removing the substantive parameters of the constitutionally conferred right from legislative control.[11] Accordingly, while the legislature can enact procedural requirements for enforcing the right to sue granted under Section 10(A) indeed Section 10(C) mandates that the legislature do sothe legislature cannot enact substantive requirements that would curtail, abridge, impair or burden the exercise of such constitutionally conferred right.[12]
(ii) Section 10(B)Waiver in Other Suits:
In stark contrast to Section 10(A)'s mandatory, automatic waiver language (providing that there "shall" be no immunity in contract and tort suits), Section 10(B) employs permissive, legislative waiver language (providing that the legislature "may" authorize other suits against the state). See 3 Sutherland Stat. Const. § 57.03 (5th Ed. 1992) (noting general rule that the verb "shall" is mandatory and "may" is permissive); see also LSA-C.C.P. Art. 5053. As evidenced by the continuation of the legislative consent method for "other suits", Section 10(B) retains some vestige of sovereign immunity as a viable doctrine. See Burmaster v. Gravity Drainage Dist. No. 2 of Parish of St. Charles, 602 So.2d 1045 (La.App. 5th Cir.), writ denied, 608 So.2d 167 (La.1992) (applying Section 10(B) to find governmental entity possessed sovereign immunity in suit not involving "injury or property" where legislative consent had not been obtained); Two O'Clock Bayou Land Co. v. State of Louisiana, 415 So.2d 990, 992 (La.App. 3d Cir.1982) (same). Significantly, as demonstrated below, it is this retained immunity in Section 10(B) that was at the root of our labelling this constitutional proscription against sovereign immunity as a "limited" one in Sibley I. 462 So.2d at 153 n. 3 (quoting Hargrave, supra at 650).
(iii) Section 10(C)Procedure; Judgments:
The powers Section (C) allocates to the legislature are two-fold. First, Section 10(C) allocates to the legislature the power to establish procedures for suits authorized under *883 Sections 10(A) and 10(B). Pursuant to this provision, we held that the legislature has the power to authorize non-jury trials in cases involving governmental entities and that this does not violate the waiver of sovereign immunity. Jones v. City of Kenner, 338 So.2d 606 (La.1976); see also Peebles, Governmental Tort Liability in Louisiana: A Response to Professor Robertson and A Call For More Study, 65 Tul.L.Rev. 1055, 1061 n. 33 (1991) ("Peebles") (noting that Section 10(C) apparently allows different procedural rules in public and private suits). We note that this part of Section 10(C), authorizing the legislature to establish procedural rules, does not authorize the establishment of the statutory ceiling on general damages imposed by LSA-R.S. 13:5106(B)(1). Indeed, in Socorro v. City of New Orleans, 579 So.2d 931 (La.1991), we classified LSA-R.S. 13:5106(B)(1) as substantive since it has the effect of changing the law regarding the amount of recoverable tort damages, reasoning that "[t]he very substance of the claim for damages, the amount thereof, is affected by the legislation." Id. at 944.
Section 10(C) also "is aimed at protecting the public fisc and seeks to avoid governmental priorities being upset by the payment of substantial money judgments." Hargrave, supra at 655. To accomplish that goal, Section 10(C) also allocates to the legislature the power to enact legislation with respect to the enforcement of judgments against the state and to provide for appropriations. Provided such legislation comports with due process, equal protection, and the other constitutional guarantees, such legislation is valid. Id. at 655-56. As a whole, LSA-Const. Art. XII, § 10 thus was a "true compromise," permitting a plaintiff to sue and to obtain a judgment, but allowing the legislature to determine when and how to pay such judgment. Id. at 654. By providing that no judgment against the state shall be payable except from funds appropriated by the legislature, the constitution provides the legislature with substantial authority to protect the public fisc.

VII.
Apparently anticipating the current constitutional challenge, the legislature concluded its recital of legislative findings in LSA-R.S. 13:5106(E), quoted above, with the following disclaimer:
(4) That the purpose of this Section is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the constitution.
Of course, a statute's constitutional validity cannot stand on such a legislative disclaimer alone. Nor can such a disclaimer substantively save an otherwise constitutionally infirm statute. CISPES (Committee in Solidarity with People of El Salvador) v. F.B.I., 770 F.2d 468, 474 (5th Cir.1985). Hence, while we recognize that the above disclaimer expresses the legislature's intent that by enacting the statutory ceiling at issue it was not resurrecting sovereign immunity, we nevertheless are bound by the wording of the constitutional provision and by our prior jurisprudence to reach a contrary result.
When a constitutional challenge is made, the constitutional provision is the yardstick against which a statute is measured. See Dixon, Judicial Method in Interpretation of Law in Louisiana, 42 La.L.Rev. 1661, 1664 (1982) ("[c]onstitutional provisions are controlling and furnish the rules against which statutes are measured when their constitutional validity is attacked"); Fullilove v. U.S. Casualty Co. of New York, 129 So.2d 816, 821 (La.App. 2d Cir.1961) (constitutional provisions are the "supreme law," overriding the legislature). The waiver of sovereign immunity provision is worded as follows: "[n]either the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property." LSA-Const. Art. XII, § 10(A) (emphasis supplied). The exclusive remedy for "injury to person or property" is damages. Dobbs, Remedies § 3.1 at 135 (1973); LSA-C.C. Art. 2315. Translated, Section 10(A) thus provides that the state shall not be immune from liability for tort damages. Black's Law Dictionary 823 (5th Ed.1979) defines liability for damages as *884 "[l]iability for an amount to be ascertained by trial of the facts in particular cases." Limiting recoverable tort damages thus flies directly in the face of the constitutional proscription that the state waive sovereign immunity from liability for "injury to person or property."[13]
A ceiling on non-economic damages,[14] like LSA-R.S. 13:5106(B)(1), partially resurrects sovereign immunity because it declares, in essence, that injury inflicted by a governmental tortfeasor is not legally cognizable beyond the ceiling amount.[15] Stated otherwise, when immunity has been abolished, decreasing recovery from full compensation to a maximum ceiling partially resurrects immunity. It follows that LSA-R.S. 13:5106(B)(1)'s ceiling on general damages cannot, despite the legislature's disclaimer to the contrary in LSA-R.S. 13:5106(E)(4), be construed as anything other than a partial resurrection of sovereign immunity. Thus, we conclude that the statutory ceiling on general damages imposed by LSA-R.S. 13:5106(B)(1) conflicts with Section 10(A) and is thus unconstitutional. As established below, this construction of Section 10(A) is consistent with our prior jurisprudence.

VIII.
On two prior occasions, we have rejected attempts to abridge Section 10(A)'s unequivocal waiver of sovereign immunity from tort immunity, namely, in Segura v. Louisiana Architects Selection Board, 362 So.2d 498 (La.1978), and Jones v. City of Baton Rouge-Parish of East Baton Rouge, 388 So.2d 737 (La.1980). In Segura, we invalidated a statute purporting to exempt governmental defendants from liability for certain court costs, finding the statute conflicted with Section 10(A) and reasoning:
Costs of court are part of the "liability" to which a party cast in litigation is subject. As plaintiff in this suit Segura was required to advance costs to the clerks of the courts through which this litigation progressed. These advances ... and other costs paid by plaintiff and properly chargeable to this suit, would reduce the value of the award in Segura's favor if he could not be reimbursed to that extent. The consequence would be that the State was relieved of part of its liability. The Constitution makes no such concession.
Id. 362 So.2d at 499.
Similarly, in Jones, we declined to infer a governmental exception to LSA-C.C. Art. 2317 liability, relying solely on Section 10(A)'s "unequivocal" waiver of sovereign immunity and refusing to consider the policy argument that imposing strict liability on governmental entities would produce "chaotic results." In so doing, we reasoned that "[i]t is not the function of the courts to create an exception to this unequivocal constitutional rejection of the doctrine of sovereign immunity." 388 So.2d at 740.
Picking up on that logic in Jones, supra, and citing Segura, supra, a commentator correctly noted that "the legislature is as powerless *885 as the courts to engraft exceptions onto the `unequivocal' constitutional mandate." Murchison, Local Government Law, Developments in the Law, 1980-1981, 42 La.L.Rev. 564, 591 (1982). Accordingly, Section 10(A)'s unequivocal, self-executing waiver of sovereign immunity as to suit and liability in contract and tort cases constrains the legislature and the courts from imposing limitations on this constitutional right to sue the state.
The constitutional provision and our prior jurisprudence, however, have been viewed by some as limited, not necessarily precluding the legislature from imposing reasonable limits on recoverable tort damages. The latter view, relied on by both lower courts in the instant case, stems from our statement in Sibley I that there is "no basis to support plaintiff's contention that the Louisiana Constitution by denying the state immunity from suit in contract or tort or for injury to person or property, prohibits the Legislature's limiting in any respect recoverable tort damages." 462 So.2d at 154. Adopting that view, the district court expressed its belief that "the legislature has the power [to] limit liability as long as it does not totally abolish the remedy for tortious conduct" and that "[b]y enacting R.S. 13:5106B(1) the legislature has set parameters on the general damages which the Court may award." Similarly, the court of appeal noted that in Sibley I this court held that "limiting recoverable damages against the State does not offend Article XII, Section 10(A) of the constitution." Agreeing with Sibley I, the court of appeal found the ceiling imposed by LSA-R.S. 13:5106(B)(1) did not violate the waiver of sovereign immunity provision.
Like the lower courts in this case, other courts and commentators have continued to rely on Sibley Idespite its lack of precedential value given our granting of full rehearingas creating a damage exception to Section 10(A)'s constitutional proscription against sovereign immunity. Thibodeau v. Mayor and Councilmen of Morgan City, 619 So.2d 595 (La.App. 1st Cir.1993); Salter v. State Through Dept. of Health and Human Resources, 612 So.2d 163 (La.App. 1st Cir. 1992); see also Industrial Risk Insurers v. New Orleans Public Service, Inc., 735 F.Supp. 200, 202 (E.D.La.1990) (citing Sibley I for the proposition that "a statute which limits in any respect recoverable tort damages against the state does not violate this constitutional provision").
Synthesizing this proposed damage exception and noting its ambiguous status, a commentator stated:
[T]he Louisiana Supreme Court's opinion following original hearing in Sibley suggested [a] possible exception to the waiver provision. Emphasizing the "limited" scope of the constitutional waiver, the court indicated that the 1974 Louisiana Constitution permits the Legislature to place a ceiling on the amount of damages that can be awarded against governmental defendants so long as it does not alter the substantive rules of liability. Unfortunately, the present status of this potential exception remains ambiguous because the rehearing opinion in Sibley concluded that a 1984 amendment to the statute being challenged had mooted the waiver of immunity argument.
Murchison, Local Government Law, Developments in the Law, 1984-85, 46 La.L.Rev. 491, 520 (1986). This commentator further suggested that LSA-R.S. 13:5106(B)(1) would fall within the damage exception and thus pass constitutional muster, but reemphasized that "the extent to which this portion of the original Sibley opinion survives the rehearing decisions remains unclear." Id. at 526. Unsurprisingly, DOTD cites this damage exception in support of its contention that the ceiling is constitutional. To resolve the constitutional issue before us, we find it necessary to reexamine our statements in Sibley I from which this proposed damage exception stems.
In Sibley I, we construed Section 10(A) as not precluding the legislature from placing reasonable limitations on recoverable tort damages. In so construing this constitutional provision, we relied on three premises: (i) that Section 10(A)'s constitutional proscription against sovereign immunity was a "limited" one; (ii) that the purpose of Section 10(A) was to eliminate the consent to sue requirement; and (iii) that Section 10(A) contained no limitation on statutes reducing recoverable *886 tort damages. On further analysis, we find each of these underlying premises somewhat flawed.
We based the first premisethat the constitutional proscription against sovereign immunity was a limited oneon a quote from Hargrave's article and the constitutional debates. Sibley I, 462 So.2d at 153 n. 3 (quoting Hargrave, supra at 650). The quote from Hargrave's article on which we relied reads as follows: "`[i]n short, the convention did not adopt broad sovereign immunity in all suits, but did assume that sovereign immunity existed in some areas. These areas were never defined.'" Id. Obviously, Hargrave was not referring to tort and contract suits in which sovereign immunity was constitutionally proscribed by Section 10(A), but was referring to the open-ended category of "other suits" in which sovereign immunity was retained, absent legislative consent, by Section 10(B). In short, the limited nature of the waiver refers to the vestige of immunity retained under Section (B). Consequently, our reliance on the limited nature of the waiver to infer an exception to Section 10(A)'s unconditional waiver of immunity from tort liability was misplaced. See Jones, 388 So.2d at 740 (describing Section 10(A)'s waiver as "unequivocal," i.e., absolute); Robertson, Tort Liability of Governmental Units in Louisiana, 64 Tul.L.Rev. 857, 862 (1990) (describing Section 10(A) as a "full waiver of governmental immunity from suit and liability in tort").
Given that Section 10(A) is clear and unambiguous, setting forth a mandatory prohibition of sovereign immunity in tort, our reliance on the constitutional debates to infer qualifications on that waiver was likewise misplaced. When the constitutional provision contains clear and unambiguous language, "we cannot decide constitutional questions on the basis of the drafters' debate, but must rely on the finished product, which is the expression of the voters who adopted the constitution." Bank of New Orleans and Trust Co. v. Seavey, 383 So.2d 354, 356 n. 7 (La.1980); City of New Orleans v. Scramuzza, 507 So.2d 215, 217 (La.1987) ("[c]onstitutional provisions which are plain and unambiguous must be given effect"). Such is the case here.
As to the second premise, we concluded in Sibley I that Section 10(A)'s purpose was "to eliminat[e] the unnecessary, burdensome and costly first step of getting legislative approval in order to bring suit against the state or its subdivisions." 462 So.2d at 154. Based on that statement of purpose, DOTD makes the strained argument that since Section 10(A) was adopted simply to elevate the prior judicial abrogation of sovereign immunity in Splendour, supra, to constitutional status, Section 10(A)'s adoption did not abridge the legislature's traditional power to limit recoverable tort damages. In support of this argument, DOTD cites cases from other jurisdictions which hold that judicial abrogation of sovereign immunity does not bind the legislature. DOTD's argument, however, overlooks that Section 10(A)'s constitutional proscription against sovereign immunity does bind the legislature. Given the constitutional status of Louisiana's unique waiver provision, DOTD's reliance on decisions from other jurisdictions is thus misplaced. See Monteville, 567 So.2d at 1103.
A further flaw in reading Section 10(A) as simply eliminating the consent to sue requirement is that while that was surely one of the purposes prompting the adoption of this provision, it was not the only one. In prohibiting immunity from liability as well as from suit, the framers clearly intended that the state not be afforded substantive defenses, unavailable to private litigants, based simply on its governmental status. Segura, supra, and Jones, supra.
As to the third premise, we also stated in Sibley I that neither the language of Section 10(A), nor the constitutional debates, contained any expression, explicit or implicit, indicating an intent to prohibit the legislature from enacting statutes limiting recoverable tort damages. Admittedly, Section 10(A) is silent on the issue. However, on further analysis, we find our statement in Sibley I that Section 10(A) does not implicitly prohibit such statutes was incorrect as it overlooks Section 10(A)'s historical underpinnings, discussed above, and its self-executing *887 nature and the implied prohibitions resulting therefrom.
Expounding on implied constitutional prohibitions, we noted in Tanner, supra:
"To create an implied prohibition there must be some express affirmative provision. * * *" Or, as otherwise stated by Cooley in his Treatise [Cooley, supra at 176 n. 4] "... the Constitution by its inherent terms may of necessity prohibit certain acts of a legislature by reason of the inherent conflict that would arise between the terms of the Constitution and the power claimed in favor of the legislature." ... "Every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision."
47 So.2d at 913. Cooley adds that "[t]he implied restrictions of the Constitution upon legislative power may be as effectual for its condemnation as written words, and such restrictions may be found either in the language employed, or in the evident purpose which was in view, and the circumstances and historical events which led to the enactment of the particular provision as a part of the organic law." Cooley, supra at 177 n. 4.
Applying those principles here, we find that Section 10(A) is an express, affirmative provision that satisfies all the factors Cooley cites as favoring an implied constitutional limitation; specifically, the absolute waiver of liability language it employs, its intended purposes and the historical events prompting its inclusion in the constitution lead to the inevitable conclusion that the framers' intent was to limit the legislature's power to restrict such liability. Accordingly, we find, contrary to our statement in Sibley I, that the correct construction of Section 10(A) is that it implicitly inhibits the legislature's power to restrict recoverable tort damages. It follows that the proposed damage exception relied on by the lower courts directly contravenes Section 10(A).
A similar result was reached by the Montana Supreme Court under a Montana constitutional provision (later amended),[16] almost identical to Section 10(A) and of which the Louisiana constitution's framers were undoubtedly aware. Noll v. City of Bozeman, 166 Mont. 504, 534 P.2d 880 (1975); See Peebles, supra at 1084 n. 153 (noting that Section 10(A) most closely resembles Art. III, § 18 of the Montana Constitution of 1972 and citing Comm. on Legislative Powers and Functions, Staff Memorandum No. 15 (May 3, 1973), reprinted in 10 Records of the Louisiana Constitutional Convention of 1973, at 260-62 (1977)). In Noll, supra, the Montana court invalidated a statute that imposed a short time limitation on bringing suit against the state as impermissibly restricting the abolition of sovereign immunity.
To capsulize, Section 10(A)'s enactment expanded the right to sue the state, as under the prior constitution legislative approval was a prerequisite in all cases, and it restricted the legislature's power, removing its ability to tinker with this constitutional right. See Hargrave, supra at 651. It follows that the statutory ceiling on liability for general damages imposed by LSA-R.S. 13:5106(B)(1) is an unauthorized legislative act.

IX.
DOTD further suggests that Section 10(C) grants the legislature the power to limit general damages recoverable against the state. DOTD argues that since Section 10(C) provides for legislative control over the enforcement of judgments, that power implicitly includes the lesser power to place a ceiling on the amount of such judgments. Stated differently, DOTD argues that as the legislature is authorized to refuse to pay judgments, it is implicitly authorized to limit recoverable *888 tort damages. This argument is not persuasive.
It is axiomatic that Section 10(C)'s grant of authority to the legislature to provide for the effect of judgments does not come into play until after the judgment is rendered and thus gives the legislature no authority over the initial fixing of damages in actions authorized under Sections 10(A) and 10(B). The courts have rejected a somewhat similar argument that Sections 10(A) and 10(C) somehow conflict. Foreman v. Vermilion Parish Police Jury, 336 So.2d 986, 988-89 (La.App. 3d Cir.), writ refused, 339 So.2d 846 (La.1976); see also De Laureal Engineers, Inc. v. St. Charles Parish Police Jury, 406 So.2d 770 (La.App. 4th Cir.1981), writ denied, 410 So.2d 758 (La.1982). These sections each address different stages of the proceeding against the state: Section 10(A) addresses a claimant's ability to go to court and get a judgment against the state; Section 10(C) addresses the claimant's ability to enforce that judgment. The latter is within the legislature's control, the former is not.

X.
In closing, "[w]hile one may reasonably argue against the wisdom of such a broad waiver, the decision is one that is appropriately reserved for the political process in a democratic society, and the inclusive language of the constitutional provision suggests that the political processes have currently struck the balance in favor of a broad waiver." Murchison, Local Government Law, Work of Appellate Court1978-1979, 40 La. L.Rev. 681, 715 (1980); see also Board of Commissioners of Orleans Levee District v. Dept. of Natural Resources, 496 So.2d 281, 298 n. 5 (La.1986). As evidenced by the legislature's statement in LSA-R.S. 13:5106(E)(3) that the ceiling was intended "to balance an individual's claim against the needs of the public interests and the common good of the whole society," this provision was intended to serve the improper purpose of legislatively restriking the constitutionally established balance. Accordingly, we conclude that LSA-R.S. 13:5106(B)(1) conflicts with LSA-Const. Art. XII, § 10(A) and is thus invalid. We therefore hold that the lower courts erred in applying this provision to limit plaintiffs' recoverable general damages. Having so held, we pretermit consideration of plaintiffs' other constitutional arguments.

XI.
For the above reasons, we reverse the judgment of the district court, as affirmed by the court of appeal, insofar as it upholds the constitutionality of LSA-R.S. 13:5106(B)(1) and applies that statutory ceiling to limit plaintiffs' general damages to $500,000. We remand to the court of appeal for the limited purposes of addressing the quantum of plaintiffs' general damage award in the amount of $2,000,000, as itemized by the district court, and entering an amended judgment awarding general damages consistent with its quantum review and with this opinion.
REVERSED AND REMANDED.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting)
I disagree with the majority's holding that the $500,000 ceiling on general damages in a personal injury suit set forth in La.R.S. 13:5106(B)(1) is unconstitutional under La. Const. art. XII, § 10. In my view, La.R.S. 13:5106(B)(1) does not operate to restrict the plaintiff's right to sue the state for personal injury.
When viewed from the historical prospective of La.Const. of 1921 art. 3, § 35 and this court's decision in Board of Commissioners v. Splendour Shipping & Enterprises Co., 273 So.2d 19 (La.1973), it is clear that art. XII, § 10(A)'s prohibition on immunity from suit for injury to the person or property refers to the procedural ability of citizens to sue the state for tort without prior legislative authorization. This interpretation is further reinforced by considering the language in art. XII, § 10(B), which states "[t]he legislature may authorize other suits against the state...." The clear language of this provision indicates that for suits other than those on contracts or for personal injury or property damages, legislative authorization is still *889 required.[1] By contrast, under § 10(A), no legislative authorization is required for suit on contract or for personal injury or property damage. Therefore, the focus in § 10(A) and § 10(B) is on the procedural authorization to sue, not the substance of the resulting suit.
La.R.S. 13:5106(B)(1) in no way affects plaintiffs' procedural authorization to sue the state. Rather, plaintiffs' argument merely goes to amount of damages they are entitled to as a result of their suit against the state. The language used by the article makes no mention of damages. Had the framers intended to address the measure of damages the tort claimant was entitled to receive as a result of a suit against the state, they could have easily done so, as they had in other articles of the constitution.[2] Rather, they chose to leave the issue of damages to the legislature's discretion.[3]
Finally, it is significant that in Sibley v. Board of Supervisors, 462 So.2d 149 (La. 1985) (Sibley I), in the context of the $500,000 cap in the public Medical Malpractice Act, a majority of this court concluded that the sole purpose of Art. XII, § 10(A) was to eliminate the authorization requirement:
We would also point out that Article XII, Section 10(A) does not make the sweeping proscription for which plaintiff contends (i.e., statutes reducing recovery quantum offender Article XII, Section 10(A)), either explicitly or implicitly. Nor is that interpretation supported by the constitutional debates. Transcripts from the 1973 Constitutional Convention indicate that the original provision, tracking that of Article III, Section 35 of the 1921 Constitution, required legislative authorization before a lawsuit could be initiated against the state, its agencies or political subdivisions. Eight different amendments, however, each including the concept of a waiver or abolition of sovereign immunity, were offered in opposition to the committee proposal and rejected. On their ninth attempt, the delegates approved a limited waiver of sovereign immunity, a compromise which now comprises Article XII, Section 10 of the Louisiana Constitution. The transcripts indicate that the proponents of this waiver were primarily interested in eliminating the unnecessary, burdensome and costly first step of getting legislative approval in order to bring suit against the state or its subdivisions. Among those reciting this objective was the then Supreme Court Justice Albert Tate, Jr. who said:
The effect of the removal of a legislative judgment whether to permit someone to file a suit is simply to eliminate one step... and it's simply to let it go to the Court system ...

See State of Louisiana Constitutional Convention Verbatim Transcripts, July 26 and 27, Volume V, pages 397 through 433.
Therefore, we simply find no basis to support plaintiff's contention that the Louisiana Constitution by denying the state immunity from suit in contract or tort or for injury to person or property, prohibits the Legislature's limiting in any respect recoverable tort damages.
462 So.2d at 154 (emphasis added).
While it is true that a rehearing was granted in Sibley I, and the issue of sovereign immunity was raised on rehearing, this court ultimately *890 found the issue moot since the statute on medical expenses which was the basis of plaintiff's complaint had been retroactively amended to remove the discrepancy between private and public health care providers. Sibley v. Board of Supervisors, 477 So.2d 1094, 1109 (La.1985) (Sibley II). Therefore, the court in Sibley II did not pass on the issue of constitutionality before the court in Sibley I. In any event, I believe the analysis of the law presented in Sibley I is a sound one, and I would continue to adhere to the clear reasoning of Sibley I on this point.
For these reasons, I would find the $500,000 ceiling on general damages in a personal injury suit set forth in La.R.S. 13:5106(B)(1) constitutional. Accordingly, I respectfully dissent.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3, Kimball, J., was not on the panel which heard and decided this case. See the footnote in State v. Barras, 615 So.2d 285 (La.1993).
[1] LSA-R.S. 13:5106(B)(1) provides that "[i]n any suit for personal injury, the total amount recoverable, exclusive of medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars."
[2] LSA-Const. Art. XII, § 10 provides:

(A) No Immunity in Contract and Tort. Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property.
(B) Waiver in Other Suits. The legislature may authorize other suits against the state, a state agency, or a political subdivision. A measure authorizing suit shall waive immunity from suit and liability.
(C) Procedure; Judgments. The legislature shall provide a procedure for suits against the state, a state agency, or a political subdivision. It shall provide for the effect of a judgment, but no public property or public funds shall be subject to seizure. No judgment against the state, a state agency, or a political subdivision shall be exigible, payable, or paid except from funds appropriated therefor by the legislature or by the political subdivision against which judgment is rendered.
[3] LSA-C.C.P. Art. 1880 provides:

When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding. In a proceeding which involves the validity of a municipal ordinance or franchise, such municipality shall be made a party, and shall be entitled to be heard. If a statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state shall also be served with a copy of the proceeding and be entitled to be heard.
[4] LSA-R.S. 49:257(B) provides:

Notwithstanding any other law to the contrary, the attorney general, at his discretion, shall represent or supervise the representation of the interests of the state in any action or proceeding in which the constitutionality of a state statute or of a resolution of the Legislature is challenged or assailed.
[5] LSA-R.S. 13:4448 provides:

Prior to adjudicating the constitutionality of a statute of the state of Louisiana, the courts of appeal and the Supreme Court of Louisiana shall notify the attorney general of the proceeding and afford him an opportunity to be heard. The notice shall be made by certified mail. No judgment shall be rendered without compliance with the provisions of this Section; provided where the attorney general was not notified of the proceeding, the court shall hold adjudication of the case open pending notification of the attorney general as required herein.
[6] The other five statutes are as follows: (1) LSA-R.S. 13:5114(D), enacted by Act 450, authorizing governmental defendants to satisfy personal injury and wrongful death claims by structured payment plans established pursuant to court order or compromise agreement; (2) LSA-R.S. 42:1441.1-1441.4 and LSA-R.S. 29:23.1, enacted by Act 451, transferring liability for torts committed by public officers who serve at the local level from the state to the particular subdivision the officer serves, and limiting the state's master-servant liability; (3) LSA-R.S. 9:2798.1, enacted by Act 453, precluding governmental entities and their officers and employees from incurring liability for policy-making or discretionary acts or omissions; (4) LSA-R.S. 9:2800, enacted by Act 454, confirming governmental entities' liability under LSA-C.C. Art. 2317 for damages caused by buildings under their control, but limiting such liability for other things in the custody of governmental entities to situations where the governmental entity had notice of the defect that caused the injury; and (5) LSA-R.S. 13:5112(C) and 5117, enacted by Act 509, providing for court costs and limiting pre-judgment interest on personal injury and wrongful death claims against governmental defendants to six percent. See Murchison, Local Government Law, Developments in the Law, 1980-1985, 46 La.L.Rev. 491, 512-33 (1986); Comment, Limiting Strict Liability of Governmental Defendants: The Notice Requirement of the 1985 Legislation, 46 La.L.Rev. 1197 n. 4 (1986).
[7] This case involves only the constitutionality of the ceiling on general damages; the constitutionality of the other five statutory measures is not before us.
[8] Parenthetically, we note that a similar ceiling for public health care providers is set forth in LSA-R.S. 40:1299.39(F) (formerly LSA-R.S. 40:1299.39(B)). The constitutionality of that ceiling was at issue in Sibley v. Board of Supervisors of Louisiana State University, 462 So.2d 149, vacated on reh'g, 477 So.2d 1094 (La.1985), discussed below.
[9] Interestingly, one commentator forecasted that the waiver of sovereign immunity provision would be "an even more substantial [constitutional] hurdle" than the equal protection and adequate remedy provisions. Murchison, Local Government Law, Developments in the Law, 1984-1985, 46 La.L.Rev. 491, 519 (1986). Plaintiffs also add a separation of powers challenge; specifically, plaintiffs contend that the ceiling violates the separation of powers provision, LSA-Const. Art. II, because it constitutes a legislative infringement on a judicial function.
[10] In this regard, the delegate proposing the compromise at the convention explained:

[This provision] simply restricted the abolition of the immunity to contract cases, which under the present law there is no immunity anyhow, for injury to person or property, which in essence is the tort claims. Now, I've instilled and kept the concept that in all other cases ... the legislature still must authorize the suits to be filed against the State.... [W]e've added a Paragraph C, which simply applies both to the A and B sections above, which quite frankly just states that they shall prescribe the method of procedure, effects of judgment against the state, its agencies and political subdivisions.
Verbatim Transcripts, Vol. V, Records of the La. Const. of 1973, Convention Manuscripts (21st day, July 27, 1973), p. 431.
[11] See Student Government Association of Louisiana State University and Agricultural and Mechanical College, Main Campus, Baton Rouge v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 262 La. 849, 264 So.2d 916, 919-20 (1972) (legislature may not enact legislation that would defeat, abridge, interfere with, or limit the right conferred); Cooley at 171 ("legislation must be subordinate to the constitutional provision, and in furtherance of its purpose, and must not in any particular attempt to narrow or embarrass it"); see also Budetti and Knight, The Latest Event in the Confused History of Municipal Tort Liability, 6 Fla.S.U.L.Rev. 927, 944-45 (1978) (citing Vinnicombe v. State, 172 Cal.App.2d 54, 341 P.2d 705 (1959)).
[12] Constitutional provisions that address divisible matters may be partially self-executing. Board of Supervisors, 264 So.2d at 919. Such is the case with LSA-Const. Art. XII, § 10. Moreover, that Section 10(C) provides for the legislature to enact procedures for suits authorized under Section 10(A) does not distract from Section 10(A)'s otherwise self-executing nature. Id.; Cooley, supra at 170.
[13] See Peebles, Governmental Tort Liability in Louisiana: A Response to Professor Robertson and A Call For More Study, 65 Tul.L.Rev. 1055, 1091 n. 182 (1991); Murchison, Local Government Law, Developments in the Law, 1984-85, 46 La.L.Rev. 491, 531-32 (1986); Robertson, Tort Liability of Governmental Units in Louisiana, 64 Tul.L.Rev. 857, 877-79 (1990).
[14] "Non-economic" or "nonpecuniary" damages refer "to the entire class of psychic injuries, including such injuries as pain and suffering, mental anguish, emotional distress, and loss of society and companionship, all of which are commonly understood to result in subjective non-monetary losses which tort law nonetheless compensates by the award of money damages. See, Dobbs, Remedies § 8.1, at 544-45 (1973)." Hicks, Statutory Damage Caps Are An Incomplete Reform: A Proposal For Attorney Fee Shifting in Tort Actions, 49 La.L.Rev. 763 n. 5 (1989); see also Murray and Murray, The Unconstitutionality of Sovereign Immunity in OhioLast Stand for the Illegitimate King, 18 U.Tol.L.Rev. 77, 81 n. 19 (1986) (noting that "[s]omehow, these losses are deemed less `real'" than "actual" or "economic" losses).
[15] See Turkington, Constitutional Limitations on Tort Reform: Have the State Courts Placed Insurmountable Obstacles in the Path of Legislative Responses to the Perceived Liability Insurance Crisis, 32 Vill.L.Rev. 1299 n. 1, 1301-2 (1987); Schuman, The Right to a Remedy, 65 Temp. L.Rev. 1197, 1224-25 (1992); see also Kindregan and Swartz, The Assault on the Captive Consumer: Emasculating the Common Law of Torts in the Name of Reform, 18 St. Mary's L.J. 673, 698-704 (1987).
[16] The Montana constitutional provision originally contained an absolute waiver of immunity in tort, but that provision was amended in 1975 to add a proviso permitting the legislature by a two-third vote to impose limitations on the waiver of immunity. Particularly, the Montana provision (with the language added by the 1975 amendment underscored) provided:

The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a two-thirds vote of each house of the legislature. (emphasis supplied).
[1] Art. XII, § 10(B) goes on to state that "[a] measure authorizing suit shall waive immunity from suit and liability." This sentence was apparently placed in the section to avoid the problem raised in Duree v. Maryland Casualty Co., 238 La. 166, 114 So.2d 594 (1959), and Stephens v. Natchitoches Parish School Board, 238 La. 388, 115 So.2d 793 (1959), where this court held the state's waiver of sovereign immunity to be sued did not necessary mean it waived its immunity from substantive liability.
[2] For example, La. Const. art. I, § 4 provides "[i]n every expropriation, a party has a right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss."
[3] Art. XII, § 10(C) makes it clear that the legislature "shall provide for the effect of a judgment." It appears that under this section, the legislature could adopt a uniform policy under which it would pay no more than $500,000 on general damages in any personal injury. This points up an inconsistency in the majority's holding, since the legislature could create a damage ceiling under § 10(C), reaching virtually the same result which the majority finds is prohibited under § 10(A).