673 So.2d 279 (1996)
Robert LEVRON, Individually and on Behalf of his Minor Daughter, Rachel Levron
v.
STATE of Louisiana, Through the DEPARTMENT OF HEALTH & HOSPITALS, and the Louisiana Health Care Authority, Charity Hospital of Louisiana at New Orleans and Joseph John Noya, M.D.
No. 94-CA-2094.
Court of Appeal of Louisiana, Fourth Circuit.
April 24, 1996.
Rehearing Denied May 31, 1996.
*281 S.C. Garcia, III, Joseph F. Bishop, Jr., Garcia & Bishop, Metairie, for Plaintiff/Appellant, Robert Levron.
Daryl A. Higgins, Thomas W. Darling, Windhorst, Gaudry, Ranson, Higgins & Gremillion, L.L.P., Harvey, for Defendants/Appellants, State of Louisiana, *282 Through the Department of Health & Hospitals, and the Louisiana Health Care Authority, Charity Hospital of Louisiana at New Orleans and Joseph John Noya, M.D.
Richard P. Ieyoub, Attorney General, C.T. Williams, Jr., Special Assistant Attorney General, J. Elliott Baker, Blue Williams, L.L.P., Metairie, for Intervenor, State of Louisiana.
Before BARRY, CIACCIO and MURRAY, JJ.
MURRAY, Judge.
The State of Louisiana, through the Department of Health and Hospitals, and the Louisiana Health Care Authority, Charity Hospital of Louisiana at New Orleans and Joseph John Noya, M.D. (hereinafter the State) appeal the judgment of the trial court rendered February 3, 1994, in favor of Robert Levron, individually, and on behalf of his minor daughter, Rachel Levron. Plaintiffs have filed a cross-appeal claiming that the provisions of La.Rev.Stat. 40:1299.39(F) limiting judgments to $500,000 are unconstitutional. The State of Louisiana, through the Attorney General's office (hereinafter Attorney General), has intervened in the appeal in support of the constitutionality of the statute. We affirm as amended.
FACTS:
Robert Levron was diagnosed with Graves' disease or hyperthyroidism in April of 1990. His private physician, Dr. Charles Baier[1], prescribed propylthiouracil (PTU) to control the condition. Mr. Levron was monitored by Dr. Baier for his thyroid problem and for pernicious anemia, which required bi-monthly injections of vitamin B-12. On May 9, 1990 Dr. Baier ordered a second thyroid panel to determine the effectiveness of the PTU. The test results indicated that the hormone levels had dropped significantly, and Mr. Levron was continued on the PTU. On August 3, 1990 another thyroid panel revealed that all of Mr. Levron's thyroid hormone levels were within normal ranges.
Mr. Levron returned to Dr. Baier on September 10, 1990, with complaints of nausea and diarrhea that had begun about five days earlier. A physical examination revealed that Mr. Levron was jaundiced, had a temperature of 102 degrees and had tenderness above his liver. Dr. Baier diagnosed acute viral hepatitis.
Dr. Baier testified that he considered the PTU as a possible cause of Mr. Levron's liver problems because one always considers medications as a possible cause. After some research, however, he ruled out PTU-induced liver toxicity because he could find no evidence of previous cases. He then ordered a chemical profile and a hepatitis panel, and sent Mr. Levron home with instructions for management of viral hepatitis. The test results received on September 12 indicated that all of Mr. Levron's liver functions were elevated and that he had a particularly high bilirubin count of 12.0 (normal is 1.2 or below). Dr. Baier stated that the results indicated to him inflammation of the liver and liver dysfunction. He did not immediately call Mr. Levron in to the office because he still believed the correct diagnosis was viral hepatitis although he knew that it was not hepatitis A or B because those tests results were negative.
Mr. Levron returned on September 17 complaining of feeling worse with increased nausea, cramping and diarrhea. The physical examination revealed increased jaundice and tenderness above the liver. Dr. Baier told Mr. Levron that he probably had hepatitis C, which is also viral in nature, but that it could be an obstructed bile duct. He felt additional tests were needed to pinpoint the cause of Mr. Levron's problems. Because Mr. Levron was uninsured and the necessary tests were quite expensive, Dr. Baier suggested that Mr. Levron go to Charity Hospital in New Orleans for testing. He wrote a note for Mr. Levron to give the doctors at Charity, and stated that he copied Mr. Levron's test results for him to take also. The note read as follows:
Mr. Levron has apparent acute hepatitis probable non-A non-B. He needs follow-up liver functions, clotting studies, Hep C antibody and ultrasound or CT to rule out *283 obstructive cause. Also being treated for Graves disease with PTU.
Dr. Baier testified that he told Mr. Levron not to take any medications until he saw the doctors at Charity, but those instructions are not reflected in the medical records.
The next day instead of going to Charity in New Orleans, Mr. Levron drove to South Louisiana Medical Center, the state-operated hospital in Houma, because he had relatives in the area. Liver functions tests were conducted and revealed that Mr. Levron's bilirubin had risen to 22.9. However, the doctor noted that all other functions had improved based on the test results Mr. Levron had provided.[2] He diagnosed acute hepatitis, resolving. Mr. Levron was then referred to Charity in New Orleans because he lived outside the jurisdiction of the Houma facility.
The next day, September 19, Mr. Levron went to the walk-in clinic at Charity Hospital in New Orleans. Dr. Joseph J. Noya, who was the director of the clinic at that time, saw Mr. Levron. Dr. Noya testified that Mr. Levron gave him the note from Dr. Baier and a prescription bottle containing his PTU. There was conflicting testimony about whether Dr. Baier told Mr. Levron to continue his medication: Mr. Levron stated that he was instructed by Dr. Baier to continue his PTU; Dr. Baier stated that he told Mr. Levron to not take any medication until he was seen at Charity; Dr. Noya said no indication was given as to what the patient was told to do, although it was his impression that Mr. Levron was continuing to take his PTU.
The physical examination revealed that Mr. Levron was jaundiced and that his liver was enlarged. Because his abdomen was flat and soft with no tenderness, Dr. Noya opined that the patient's jaundice was caused by hepatocellular injury, rather than because of an obstruction. He therefore did not order an ultrasound or CT scan, but did order an extensive battery of blood work and urinalyses.[3] Some of the test results were available that day, one of which revealed a bilirubin count of 30.8. Dr. Noya told Mr. Levron that he probably had hepatitis B because that is the most common form. Dr. Noya testified that he verbally instructed Mr. Levron on what precautions he should take because of the hepatitis, and further told him to stop taking his Ansaid, an anti-inflammatory drug he was taking for arthritic pain. After checking Mr. Levron's pulse and finding it high, Dr. Noya stated that he did not want Mr. Levron to stop taking the PTU because he was concerned about a possible thyroid storm, a potentially life-threatening situation. When asked why he did not consult with Dr. Baier about the thyroid condition, Dr. Noya stated, "Just that we were busy[4], and he was already being followed by Dr. Baier." Dr. Noya also testified that the patient had been sent to Charity for follow-up tests for his hepatitis, not because of his thyroid disease. Mr. Levron and his mother, who was with him in the examination room at all times, both testified that they had no recollection of Dr. Noya instructing Mr. Levron to return to Dr. Baier or to stop taking his Ansaid, nor do the medical records reflect such instructions. Dr. Noya also stated that he knew at the time of Mr. Levron's first visit to Charity that PTU could be hepatotoxic causing several idiosyncratic reactions. However, he believed that any reaction to PTU would have occurred within the first month to six weeks of use, and because Mr. Levron had been using PTU for five to six months, it was unlikely PTU was causing his problems. He was more concerned about Mr. Levron's possible reaction to being taken off of PTU, but never considered consulting Dr. Baier or an internist or endocrinologist on staff at Charity.
Mr. Levron was sent home with written instructions for management of hepatitis and was told to return for his other test results on September 28. When he returned, he was in a much worsened condition. His pulse *284 was 180, his eyes were grossly icteric (yellow) indicating increased jaundice, and his abdomen was tender to deep palpation. Upon reviewing the remainder of the test results from September 19, Mr. Levron's condition was assessed as liver disease possibly secondary to PTU liver toxicity. A staff endocrinologist was consulted, and a final diagnosis and decision to admit Mr. Levron for in-patient care was made.
Mr. Levron's condition continued to worsen after admission to Charity, and on October 5, he was transferred to Ochsner Hospital, where a liver transplant was performed on October 8, 1990.
A medical review panel issued an opinion on February 12, 1992, finding that the State and Dr. Noya failed to comply with the appropriate standard of care as charged in the complaint. In written reasons, the panel stated:
1. PTU is not a commonly known hepatotoxic agent.
2. To prescribe a hepatotoxic drug to a patient with known liver problems is a deviation of the standard of care.
3. Charity Hospital failed to follow their own procedure for notifying a patient with abnormal lab work.
4. The panel is unable to answer the question as to whether or not the patient suffered damage.
Mr. Levron subsequently filed a petition against the State and Dr. Noya on April 22, 1992.
The same panel was convened a second time to consider additional evidence of Mr. Levron's use of other known hepatotoxins such as anti-inflammatory drugs and Tylenol, and his alleged heavy use of alcohol. In August of 1993 after considering the additional evidence, the panel again found that Dr. Noya and Charity failed to comply with the appropriate standard of care.
After a three-day trial, the judge found Dr. Noya and the State negligent. In written reasons for judgment the judge estimated Mr. Levron's general damages at $500,000 and his loss of earning capacity at $250,000. He estimated Rachel Levron's damages at $20,000. The judge stated that the cap imposed by La.Rev.Stat. 40:1299.39(F) was applicable and thereby reduced Mr. Levron's award to $480,000, plus past and future medical expenses, interest from the date of judicial demand and costs, including plaintiffs' experts' fees. The judge also noted:
The connection between PTU and hepatitis is extremely remote. Dr. Noya was not negligent in failing to take plaintiff off PTU immediately. But when plaintiff went to Charity on September 19th, he was ill with Graves' disease and hepatitis, a very difficult combination of illnesses to manage. Dr. Noya testified he told plaintiff to return to his treating physician. This advice was not noted in the chart and I do not believe it was given. Dr. Noya was very busy that day (300 patients were mentioned). He could not possibly recall what advice was given. More telling, Plaintiff, who was very ill did not return to Dr. Baier. Instead he returned to Charity on September 28, as instructed, by which time his liver was irreversibly damaged. Dr. Noya was negligent in failing to send plaintiff back to Dr. Baier.
The State filed a motion for a new trial, which was denied. Mr. Levron also filed a motion for a new trial and for amendment of judgment, alleging the court erred in applying the legislatively imposed cap on damages, in not awarding interest from the date a medical review panel was requested, and in not specifying in the judgment that Mr. Levron was in need of future medical care and treatment. The motion for a new trial was denied as to the applicability of the cap, but otherwise granted, and an amended judgment was rendered on March 25, 1994. The new judgment awarded Mr. Levron interest from the date the medical review panel was requested and specified that Mr. Levron was in need of future medical care and related benefits related to the loss of his liver.
DISCUSSION:
The State makes four assignments of error: 1) The trial court's finding that Dr. Noya was negligent is not supported by the evidence and is therefore clearly wrong; and 2) the court erroneously found that any negligence on Dr. Noya's part caused Mr. Levron to undergo a liver transplant. Alternatively, *285 the State alleges that 3) assuming the loss of chance doctrine applies to the present case, the court was in error in not limiting the damage award to only the percentage of loss of chance caused by Dr. Noya's alleged negligence; and 4) the court was in error in entering an amended judgment when plaintiffs' motion for new trial was not filed timely.
In its first assignment of error the State questions the trial court's finding that Dr. Noya was negligent in treating Mr. Levron during his first visit to Charity on September 19, 1990. The State claims that the majority of the testimony centered on the use of the drug PTU, that is, whether or not Dr. Noya should have told Mr. Levron to discontinue taking the drug. In its reasons for judgment the trial court stated that Dr. Noya was not negligent in failing to take Mr. Levron off the PTU, but that he was negligent in not sending Mr. Levron back to Dr. Baier, his treating physician, for management of his Graves' disease. Therefore, the State argues that because the bulk of the evidence concerned whether continued use of PTU caused Mr. Levron's injuries, not whether Dr. Noya should have referred him back to Dr. Baier, there was simply not enough evidence to support the court's finding.
Mr. Levron argues that there is overwhelming evidence to support a finding of negligence on the part of Dr. Noya, whether that finding is based on not discontinuing the use of PTU or not referring Mr. Levron back to Dr. Baier. He argues that reasons for judgment do not constitute the judgment, and therefore the judgment should be upheld if the record contains a reasonable basis for the ultimate ruling. We agree to an extent with both arguments. An appeal is taken from a final judgment rather than from the written reasons. However, because those reasons for judgment are part of the record which we are constitutionally mandated to review in its entirety, they are within the scope of our review. Based on that review, we find that the trial court was not manifestly erroneous in its final judgment.
The standard of review on appeal after a trial on the merits is to determine if the trial court's findings are reasonable in light of the record reviewed in its entirety. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990). Because a court of appeal has a constitutional function to perform, we have the right to determine whether the trial court's judgment was clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Dept. Ambulance Serv., 93-3099 (La. 7/5/94), 639 So.2d 216, 221.
We first note that in a medical malpractice action a plaintiff must prove that:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La.Rev.Stat.Ann. 9:2794(A) (West 1991). Thus, a plaintiff must establish the standard of care applicable to the charged physician, a violation by that physician of that standard of care, and a causal connection between the physician's alleged negligence and the plaintiff's injuries resulting therefrom. To determine whether a physician possesses the requisite degree of knowledge or skill or whether he exercised reasonable care or diligence, the court is guided by expert witnesses who are members of the medical profession and who are qualified to testify. Jackson v. State through Charity Hosp. of Louisiana at New Orleans, 94-2090 (La. *286 App. 4th Cir. 5/16/95). 655 So.2d 795. Both sides in this case offered extensive expert testimony.
Plaintiffs offered the testimony of Dr. Paul Villien, an emergency room doctor who served on the two medical review panels convened in this case. Dr. Villien was accepted as an expert in the field of emergency room medicine. He explained that the first panel found Dr. Noya and Charity Hospital negligent, and that a second panel was convened to consider not only the involvement of PTU in the case, but also all other medications which Mr. Levron was taking and his alleged abuse of alcohol. After such consideration, the second panel again found both Dr. Noya and Charity Hospital negligent.
Although the panel concluded that PTU was not a commonly known hepatotoxin, Dr. Noya testified that he knew that it could be, but feared Mr. Levron would suffer a thyroid storm if taken off the PTU. Dr. Villien testified that under those circumstances he should have tried to contact Dr. Baier to determine what Mr. Levron's condition was relative to the Graves' disease. Dr. Villien reviewed the lab reports and noted that all of the results were available late on September 20. Several of the tests showed extremely high liver functions, for example, a bilirubin reading of 30.8. It was Dr. Villien's opinion that Charity was negligent because its lab did not notify Dr. Noya of the abnormal results immediately, and in turn, Mr. Levron. Instead, no one on staff at Charity reviewed the results until Mr. Levron returned on September 28. Dr. Villien testified that as an emergency room doctor, he would have hospitalized Mr. Levron after reviewing the results of the lab work, or consulted with an internist or endocrinologist as to whether or not the patient should be hospitalized. Additionally, upon learning that Mr. Levron did not have hepatitis A or B as originally suspected, it would have been much more apparent that the patient's condition was due to a hepatotoxin, namely PTU, and that he should discontinue its use.
Dr. Kathleen Rives was called to testify for the defendants. She was recognized as an expert in endocrinology, with thirty plus years experience. When asked if she thought it would be an appropriate standard of care for a physician, who sees a patient because of suspected hepatitis, to discontinue that patient's use of PTU for Graves' disease, she replied:
No. I think that would be bad, for two reasons. One, the prescribing physician who put him on the PTU for the right reason and the right dose should make that decision. It's the treating physician as far as that's concerned. And as I understand it, this patient was sent to Charity Hospital and he came into the walk-in clinic and was checked, got another little piece of paper, and the note seemed to me to say that he was sent there for a further evaluation, including all these expensive liver tests or CT scan or echo or whatever. And these are expensive tests. And he had, I was told, no insurance, and so he was trying to save the patient money. But he was not sent to Charity Hospital Walk-in Clinic to make a decision about PTU because he didn't have any insurance. (emphasis added)
Based on her review of the record, she opined that Mr. Levron presented himself at the walk-in clinic appearing severely jaundiced, indicating liver disease. Dr. Noya initiated testing for that. Additionally, Dr. Noya did some cursory research into the toxicity of PTU and found that idiosyncratic reactions normally take place within the first three to four weeks of therapy; Mr. Levron had been on PTU since April so Dr. Noya logically ruled out PTU as a cause. Also, because Mr. Levron was hyperthyroid, Dr. Noya was faced with either taking the patient off of PTU, which he did not believe was the culprit, or risking the patient having a thyroid storm, which could be fatal. It is clear from Dr. Rives's above testimony that Dr. Noya should have either consulted with Dr. Baier regarding his concerns about the continued use of PTU or referred Mr. Levron back to Dr. Baier for management of his Graves' disease. Failing to do either was a deviation from the acceptable standard of care. However, it is also clear from Dr. Rives's subsequent testimony that she believed Dr. Noya told Mr. Levron to return to Dr. Baier. She testified that it was her understanding that *287 Dr. Noya told Mr. Levron to take the PTU for another day or two and "get back to his prescribing doctor to decide about an alternative form of therapy." Specifically, Dr. Rives was asked under cross-examination:
Q. And so it was your feeling that it would not have been appropriate on September 19, 1990, to simply say to Mr. Levron, `Go home, return to the clinic in a week,' period, and give him no other instructions?
A. That was not my understanding of what happened.
Q. No. I understand. But I am asking you, would it have been appropriate for Dr. Noya to say to Mr. Levron on September 19, 1990, go home and come back in a week without any other instructions, under the circumstances we are faced with in this case?
A. Well, as I said, that is not my understanding of what happened, but, no, that would not have been appropriate.
Based on the expert testimony offered by both sides, we conclude that the standard of care required under the circumstances of this case was breached. Dr. Rives stated what she believed would constitute such a breach but that she did not believe Dr. Noya had breached that standard because of her understanding that he had told Mr. Levron to return to Dr. Baier for treatment of his Graves' disease. However, the trial court did not find that to be the case. In written reasons for judgment, the judge specifically stated, "Dr. Noya testified that he told plaintiff to return to his treating physician. This advice was not noted in the chart and I do not believe it was given. Dr. Noya was very busy that day (300 patients were mentioned). He could not possibly recall what advice was given." It is well settled that a court of appeal may not set aside a trial court's finding of fact in the absence of manifest error, and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, supra.
Based on Dr. Villien's testimony that in his opinion Dr. Noya breached the acceptable standard of care, Dr. Rives's testimony that if indeed Dr. Noya did not refer Mr. Levron back to his treating physician for treatment of his Graves' disease he would have breached the appropriate standard of care, and the trial court's finding that Dr. Noya had not referred Mr. Levron back to Dr. Baier, we cannot say that it was manifestly erroneous for the court to find Dr. Noya negligent.
The State's second assignment of error is that even if the trial court's finding that Dr. Noya was negligent is not clearly wrong, there was error in finding that Dr. Noya's negligence caused Mr. Levron an injury he would not have otherwise incurred.
The State argues that in addition to proving Dr. Noya's negligence, Mr. Levron must prove by a preponderance of the evidence that removal of his liver would not have been necessary if Dr. Noya had referred him back to Dr. Baier. It cites Byrd v. State through Dept. of Public Safety and Corrections, 93-2765 (La. 5/23/94), 637 So.2d 114, to support this proposition. The State argues that the Byrd court did not apply the loss of chance of survival analysis formulated in Hastings[5] and Smith[6], but instead used a different burden of proof. We disagree. The Byrd court did not apply the loss of chance analysis because it did not find that the defendant's negligence caused the plaintiff's injury; therefore the loss of chance analysis was inapplicable. We believe *288 that the loss of chance analysis formulated in Hastings and Smith is still viable.
The Smith court, citing Hastings, stated:
LSA-R.S. 9:2794(A)(3) requires the plaintiff to prove that as a `proximate result' of the defendant's failure to provide the required degree of care, `the plaintiff suffered injuries that would not otherwise have been incurred.' In a situation where the patient dies, we have held that the plaintiff does not have to shoulder the `unreasonable burden' of proving that the patient would have lived had proper treatment been given. [citation omitted] Instead, the plaintiff must prove `only that there would have been a chance of survival,' and that the patient was denied this chance of survival because of defendant's negligence.
Smith, supra at 820. Further, a defendant's conduct "must increase the risk of a patient's harm to the extent of being a substantial factor in causing the result but need not be the only cause." Hastings, supra at 720. The question for the trier-of-fact is: was the increased risk caused by the defendant's negligence a substantial factor in producing the harm? Thus, it is not necessary to prove that Mr. Levron would not have undergone a liver transplant, but only that there was a chance his liver could have been saved. Destruction of a two percent chance of survival (in a death case) has been held to present a jury question as to causation. Id.
The State argues that Mr. Levron must prove by a preponderance of the evidence that Dr. Noya's negligence was a proximate cause of his injuries. However, in Fairchild v. Brian, 354 So.2d 675, 679 (La.App. 1st Cir.1977), writ denied, 356 So.2d 437 (La. 1978), a case involving loss of eyesight, the court explained that the crucial question was not whether plaintiffs had proven by a preponderance of the evidence that the patient had a retinal detachment as of the date she first consulted the defendant, but rather whether plaintiffs' failure to receive the proper standard of care contributed to her injury.
There is ample evidence to support a finding that Dr. Noya's negligence was a substantial factor in causing Mr. Levron to undergo a liver transplant. We find that the record supports a conclusion that if Dr. Noya had told Mr. Levron to stop taking PTU, which Dr. Noya knew to be a hepatotoxin, and then referred him back to Dr. Baier for alternative treatment of his Graves' disease, that there was a substantial chance Mr. Levron's liver could have been saved.
Plaintiffs' expert, Dr. James Grendell, testified by deposition for both discovery and trial purposes. He is board certified in internal medicine with certification in gastroenterology and liver diseases as a subspecialty. Dr. Grendell stated that as of September 10, Mr. Levron's first visit to Dr. Baier with complaints of jaundice, there was no evidence of irreversible liver damage. Mr. Levron had clear mentation and had only shown signs of illness for about one week prior to this visit. He further stated that it was his expert opinion that if PTU had been discontinued as of September 19, there was a chance for a complete spontaneous recovery without the need for a transplant. Dr. Grendell explained that the liver has "an amazing capacity for regeneration in response to acute or subacute injury like this, if the insult is stopped in time while there's still enough functional liver cells to allow it to regenerate." He based his opinion on a comparison of his personal treatment of two patients, both being treated for hyperthyroidism with PTU, and both with elevated liver functions, with Mr. Levron's medical history. Both patients recovered fully in a couple of months once the PTU was stopped.
Dr. Villien also testified as to causation. Although he could not say whether Mr. Levron's continued use of PTU from September 19th to the 28th caused Mr. Levron's liver failure, he did state that if a patient is kept on medication that causes liver damage, there is a strong possibility that the medication will contribute to the deterioration of his condition. Specifically, Dr. Villien was asked:
Q. So if you take him off, that's the only chance or the only possibility he has of not continuing to contribute and having the liver regenerate?
A. That's correct.
*289 Dr. Philip Boudreaux, a physician on the transplant team at Ochsner, testified that he could not tell at what point Mr. Levron's condition became irreversible. By the time he saw Mr. Levron he was already showing signs of encephalopathy (reduced level of consciousness). However, Dr. Boudreaux stated that outward signs alone do not indicate the need for a transplant; some patients have no outward signs but need transplants. It is possible for a patient who presented with symptoms such as Mr. Levron's to leave the hospital without a transplant.
Accordingly, the record sufficiently supports the trial court's finding that but for Dr. Noya's negligence, there was a chance that Mr. Levron would not have needed a liver transplant.
In its third assignment of error, offered in the alternative, the State argues that if this court affirms the trial court's decision, the award should be altered to reflect only the damages that Dr. Noya caused.
Mr. Levron agrees that it is his burden to prove damages, and that he has done so very well. The record includes uncontroverted testimony that Mr. Levron will be disabled for the remainder of his life, and that his life expectancy has been greatly reduced because of the liver transplant; his earning capacity has been reduced; he may require another transplant; because of the drugs he must take to prevent rejection of the new liver, he must live an extremely sheltered life, avoiding most social occasions to avoid risk of infection. Additionally, Mr. Levron can no longer care for his daughter Rachel, with whom he enjoyed a close and loving relationship. The record supports Mr. Levron's contentions and he has met his burden of proving damages. We find no error in the trial court's calculation of damages.
The State's last assignment of error, also argued in the alternative, is that the amended judgment of March 23, 1994, should have no effect. It claims that the trial court was without authority to amend the judgment to provide that interest would be due from the date Mr. Levron requested a medical review panel, because plaintiffs' request for a new trial was not filed timely.[7]
Plaintiffs argue that because they are entitled to interest as a matter of law in a damage action against the state, the trial court does have authority to amend the judgment pursuant to La.Code Civ.Proc. art. 1972.
A final judgment may be amended by the trial court with or without notice, on the motion of any party or on its own motion, at any time to alter the phraseology of the judgment, but not the substance, or to correct errors of calculation. La.Code Civ.Proc. art. 1951. A final judgment cannot be amended substantively unless a motion for new trial has been filed and granted. O.ME.R. S.p.A. v. Vendredi II, 560 So.2d 34 (La.App. 4th Cir.1990); Villaume v. Villaume, 363 So.2d 448 (La.1978).
Accordingly, we do not need to address the issue of whether plaintiffs' motion for a new trial was filed timely.[8] Because the trial court partially denied plaintiffs' motion for a new trial, it was without authority to amend the February 3, 1994, judgment. Plaintiffs' argument that La.Code Civ.Proc. art. 1972 allows the court to amend a judgment when it is contrary to the law is flawed. That article clearly states that such an amendment can be made only upon the granting of a motion for new trial. In the instant case, the court denied plaintiffs' motion for new trial, but granted its motion to amend the judgment. The trial court was without authority to do so and the amended judgment is thus invalid. However, because this issue was properly raised on appeal, it is within this court's scope of review.
*290 Louisiana Revised Statute Annotated 13:4203 (West 1991) provides that "[l]egal interest shall attach from the date of judicial demand, on all judgments, sounding in damages, "ex delicto", which may be rendered by any of the courts." Louisiana Revised Statute Annotated 40:1299.39.1(K) (West 1992) provides that "[f]or the purpose of determination of interest, the medical malpractice panel procedure shall be considered equivalent to court procedures." Accordingly, we amend the February 3, 1994 judgment to reflect that interest shall run from the date plaintiffs requested that a medical review panel be convened, and additionally, that Mr. Levron is in need of future medical care and benefits.
In his appeal, Mr. Levron has asserted that the provisions of La.Rev.Stat.Ann. 40:1299.39(F) (West 1992) limiting judgments to $500,000 are unconstitutional. The State, through the Attorney General's office, intervened in the appeal to challenge the attack on the statute.
The Attorney General first claims that the plaintiffs did not raise properly the issue of constitutionality in the trial court. We agree. The Supreme Court discussed this issue most recently in Vallo v. Gayle Oil Co., Inc., 94-1238 (La. 11/30/94), p. 6-7, 646 So.2d 859, 864. The Court explained that originally it had made an overly broad interpretation of La.Code Civ.Proc. art. 1880.[9] Thus, the Court clarified that when the constitutionality of a statute is challenged in a declaratory judgment action, the attorney general must be served. In all other proceedings in which the constitutionality of a statute is challenged, the attorney general should be served. The Court specifically noted that the holding of Lemire that the constitutionality of a statute must first be questioned in the trial court and that the plea of unconstitutionality must be specifically pled to be considered by the trial court, was still intact. Id.
The Court further explained that a long-standing jurisprudential rule mandates that a statute must first be questioned in the trial court, not the appellate courts, and the unconstitutionality of a statute must be specially pleaded and the grounds for the claim particularized. Id. at p. 8, 864-865. Pleadings allowed in civil actions are petitions, exceptions, written motions and answers. Therefore, when the unconstitutionality of a statute is specifically pled, the claim must be raised in a petition, an exception, a motion, or an answer. It cannot be raised in a memorandum, opposition or brief as those documents do not constitute pleadings.
First, plaintiffs did not specifically plead that La.Rev.Stat.Ann. 40:1299.39(F) (West 1992) was unconstitutional. Rather, in the original petition it was alleged: "Any limitation of defendants' liability for petitioners' damages imposed under any federal or state law is unreasonable and/or unconstitutional under both state and federal law." The plaintiffs did raise the issue again but it was in the memorandum in support of its motion for new trial; it was not specifically raised in the motion itself. Finally, the plaintiffs made a claim in a post-trial memorandum. None of these attempts at addressing the unconstitutionality of the statute are sufficient.
However, under La.Code Civ.Proc. art. 2164, this court shall render any judgment which is just, legal, and proper upon the record on appeal. Because the Attorney General has intervened in the appeal and both sides have thoroughly briefed the issue, in the interest of judicial economy, we will address the issue rather than remand the case for hearing.
Plaintiffs argue that La.Rev.Stat.Ann. 40:1299.39(F) (West 1992) imposes a ceiling on general damages for injury or death in claims against the state for negligent health care, which limitation violates La. Const. art. XII, § 10, citing Chamberlain v. State through Dept. of Transp. and Dev., 624 So.2d 874 (La.1993) as support. In Chamberlain the Supreme Court specifically ruled that the legislature may not impose a ceiling on general damages in a personal injury suit against the state. Plaintiffs also cite Rick v. *291 State through Dept. of Transp. and Dev., 93-1776, 93-1784 (La.1/14/94), 630 So.2d 1271, which struck down as unconstitutional a statute that limited pre-judgment interest against the state.
Although we acknowledge a trend in recent cases declaring unconstitutional some legislatively-imposed ceilings on general damage awards in other types of tort actions, this is a medical malpractice action, and as such, we are bound by Louisiana Supreme Court rulings in that area. Accordingly, we must follow the decision in Butler v. Flint-Goodrich Hosp., 607 So.2d 517 (La.1992), cert. denied, 508 U.S. 909, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993), which held that a malpractice victim's recovery against a health care provider constitutionally can be limited. The Chamberlain court acknowledged its ruling in Butler and did not overrule that decision. Chamberlain, supra at 879.
Also, this court in Payne v. New Orleans Gen. Hosp., 627 So.2d 221 (La.App. 4th Cir. 1993), writ denied, 93-3070 (La. 10/7/94), 644 So.2d 629, rejected the Chamberlain argument noting that Butler was not overruled, stating:
[A]t the very least this illustrates that our Supreme Court had Butler well in mind and did not inferentially overrule it. Moreover, it is illogical to say that the Louisiana Supreme Court would cite Butler for authority in an opinion if it intended to inferentially overrule it in that very case.
Payne, supra at 223.
We note that although the Supreme Court has not addressed La.Rev.Stat.Ann. 40:1299.39(F) (West 1992) in the context of La. Const. art. XII, § 10, the reasoning of Butler upholding the overall cap is applicable. Accordingly, we affirm the trial court's application of the legislative cap to the general damage award in this case.
For the reasons set forth above, we vacate the amended judgment of the trial court, and amend the original judgment to award interest to plaintiffs' from the date the medical review panel was requested, and to find Mr. Levron in need of future medical care and benefits. We affirm the judgment in all other respects. All costs of the appeal are assessed to the State.
AFFIRMED AS AMENDED.
BARRY, J., concurs with reasons.
BARRY, Judge, concurs with reasons.
The majority states that plaintiffs did not properly raise the unconstitutionality of La. R.S. 40:1299.39(F) in the trial court. That issue is not before this Court.
In Nelson v. Pendleton, 612 So.2d 908 (La.App. 4th Cir.1993), writ denied, 615 So.2d 337 (La.1993), this Court utilized the loss of chance of survival to the loss of an organ (a kidney), and noted that Smith v. State through Department of Health and Human Resources Administration, 523 So.2d 815 (La.1988), approvingly cited Fairchild v. Brian, 354 So.2d 675 (La.App. 1st Cir.1977), writ denied, 356 So.2d 437 (La. 1978), which used the analysis to deal with the loss of eyesight. The Byrd court cited Smith on the issue of causation. The loss of chance of survival analysis was properly used by the trial court.
NOTES
[1] Plaintiffs filed a separate action against Dr. Baier in the 22nd Judicial District.
[2] Dr. Noya stated that Mr. Levron only had a note from Dr. Baier when he presented himself at Charity New Orleans. Apparently, Mr. Levron gave the copies to the doctor in Houma, but they were not returned to him.
[3] Although Dr. Baier's note stated patient had probable non-A non-B hepatitis, Dr. Noya stated that he did not know exactly what tests Dr. Baier had done, so he retested.
[4] Dr. Noya testified that the clinic saw between 200-300 patients that day.
[5] Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La.1986).
[6] Smith v. State through Dept. of Health and Human Resources, 523 So.2d 815 (La. 1988).
[7] Although the judge added to the amended judgment a finding that Mr. Levron was also in need of future medical care and benefits, the State did not raise that as an issue on appeal.
[8] Based on the record before us, it is impossible to determine if plaintiffs' motion was filed timely. The record does not contain a notice of signing of judgment as required by La.Code Civ.Proc. art. 1913; therefore we do not know when the parties received the judgment, and hence, when the delays began to run.
[9] La.Code of Civ.Proc. art. 1880 deals with declaratory judgments. The Court's ruling was in Lemire v. New Orleans Public Serv., Inc., 458 So.2d 1308 (La.1984).